UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - -

UNITED STATES OF AMERICA,      : CRIMINAL NO. 1:12-CR-95-7
                               :
             Plaintiff,        : Excerpt of Preliminary Hearing:
                               :  Testimony of Joseph Reder,
      -vs-                     :  Robert Bohl, and Jeanette
                               :  Trifillis
DARIAS GHIZZLE JACKSON,        :
                               : Thursday, January 23, 2020
             Defendant.        : Cincinnati, Ohio

- - -
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STEPHANIE K. BOWMAN, MAGISTRATE JUDGE
- - -


For the Plaintiff:  Kelly K. Rossi
                    Special Assistant United States Attorney
                    221 East Fourth Street, Suite 400
                    Cincinnati, Ohio  45202


For the Defendant:  Ravert J. Clark
                    114 East Eighth Street, Suite 400
                    Cincinnati, Ohio  45202




Courtroom Deputy:   Kevin Moser

Court Reporter:     Julie A. Wolfer, RDR, CRR
                    100 East Fifth Street
                    Cincinnati, Ohio  45202

- - -




Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

PROCEEDINGS

* * *

THE COURT: Agent Reder, if you will please stop and raise your right hand to be sworn.

(Witness complied.)

(Witness sworn by the courtroom deputy.)

THE WITNESS: I do.

THE COURT: Miss Rossi, whenever you're ready.

MS. ROSSI: Thank you, Your Honor.

JOSEPH REDER

DIRECT EXAMINATION

BY MS. ROSSI:

Q. Good afternoon.

A. Good afternoon.

Q. Can you please state your full name and your position for the record?

A. Joseph Reder, R-E-D-E-R. I'm a special agent with the Drug Enforcement Administration Cincinnati office.

Q. And just approximately how long have you been with the DEA?

A. 14 years.

Q. And during the course of that 14-year career, have you had a recent encounter with the defendant, Darias Jackson?

A. I have.

Q. Just briefly, could you explain to the Court your familiarity with this defendant?

A.   We had a federal drug conspiracy case, I think it was 2012, that Mr. Jackson was part of.

MS. ROSSI:  Your Honor, if I may approach the witness and show him a copy of Government's Exhibit 1?

MR. CLARK:  Your Honor, if it helps, I'll stipulate to the contents of Exhibit 1.  It's a judgment entry and the rules of supervision.  I have no quarrel with that.

THE COURT:  All right.  Thank you.

MS. ROSSI:  I'll give it to this witness regardless just so that he can take a look while I question him.

THE COURT:  Thank you.

Q.   Now, Joseph -- excuse me, Agent Reder, can you briefly describe the investigation that led to this conviction that you have in your hand, this Government's Exhibit 1?

A.   Yes.  We had a several-month-long investigation into a marijuana trafficking group and a heroin group, and Mr. Jackson was part of the federal conspiracy that got indicted.

Q.   Okay.  And he was convicted of that and placed on supervised release?

A.   Correct.

Q.   And is it your understanding that his conditions of supervised release include not to commit any further state, federal, or local crimes and not to handle a firearm or any ammunition?

A.   Yes.

Q. At what point did you become aware that the defendant may have violated the supervised release conditions?

A. I believe it was a couple of months ago in October when I received an e-mail from Karl Kadon at your office.

Q. And what was your understanding at that time about what violations may have occurred?

A. We were told that Mr. Jackson had conducted -- or committed a bond violation and there was going to be a hearing.

Q. Did you become involved in the investigation surrounding the circumstances of that alleged bond violation?

A. Yes.

Q. And briefly, what was your involvement in the investigation?

A. Once we found out there was a violation, I got in contact with the ATF as well as CPD, which is Cincinnati Police Department, in order to find out what exactly had happened.

Q. Okay. As part of that involvement, did you talk to any state authorities?

A. Yes.

Q. Did you -- was one of those state authorities you spoke with Detective Robert Bohl?

A. Yes, it was.

Q. Briefly, what information did you learn from Detective Bohl?

A. So --

MR. CLARK:  Your Honor, I'm going to object only because the detective's here, and instead of the hearsay, we can be much faster with better evidence.

MS. ROSSI:  Your Honor, the Rules of Evidence don't apply, but I do believe that this is important context leading up to other aspects of the agent's testimony.

THE COURT:  All right.  Very well.  Mr. Reder, you may proceed.

A.  Essentially when I spoke to Detective Bohl, I learned that he was involved in the investigation of a shooting that took place in September of 2019 where Mr. Jackson was alleged to be the shooter.  I obtained copies of all of Detective Bohl and the Cincinnati Police Department's reports.  I reviewed those reports.  I was also sent a video of an argument that took place at the location of the shooting just prior to it.  And then after the last court hearing when we learned that there was a notarized statement, I went out with my partner and Mr. Clark, and we actually interviewed the notary public.

Q.  Okay.  And when you went out and interviewed the notary public, did you identify her as Miss Jeanette Trifillis and that she was employed at the University of Cincinnati Hospital?

A.  Yes.

Q.  And is that the same hospital where the victim in this matter received treatment?

A.  Yes.

Q. And for the record, is that victim's name Antonio Williams?

A. Yes, it is.

MS. ROSSI: Your Honor, if I may approach the witness with Government's Exhibit 2 which has been provided to defense counsel, and it is a copy of the affidavit allegedly completed by the victim, Antonio Williams.

THE COURT: Yes, you may.

For the record, Mr. Clark, are you going to have any objections to Government Exhibit 2?

MR. CLARK: No, because it's the same as my Defendant's Exhibit 1.

THE COURT: Very good.

Q. Agent Reder, is this the affidavit that you spoke with the notary, Miss Jeanette Trifillis, regarding?

A. It is.

Q. During that conversation with Miss Trifillis, did you become aware of the circumstances surrounding the notarization of this document?

A. Yes.

Q. Can you please describe like -- let me back up one second. Approximately when did you meet with Miss Trifillis?

A. It was this past Friday.

Q. Okay. Would that have been around on or about January 17th, 2020?

A. It was the 17th, and we interviewed her around 1:55 p.m.

Q. When you spoke with her, did Miss Trifillis indicate to you that the circumstances surrounding this notarization were odd or unusual?

A. Yes.

Q. Could you please describe for the Court what was unusual or odd about this situation according to Miss Trifillis?

MR. CLARK: Your Honor, I'm going to make the same objection since the witness is here. I know the rules don't apply, but we can get it firsthand or secondhand.

THE COURT: I understand. Objection sustained.

MS. ROSSI: Your Honor, I was going to inquire about the agent's opinion and his next steps relating to this testimony. Can I have him briefly describe what he was told so I can address that?

THE COURT: I'm sorry, I said "sustained." I meant overruled. Yes. Sorry. You can go ahead.

MS. ROSSI: All right. Thank you.

Q. Agent Reder, if you could explain for the Court what was unusual or odd that stood out in Miss Trifillis's mind when you spoke with her regarding the circumstances of this notarization.

A. So the first thing was when we first met, one of the initial statements was, "I was wondering when somebody was going to call me on this 'cause this was a very odd situation."

She then explained, Miss Trifillis then explained to us how

when she was called to the room of Mr. Williams for the notary, there were three people sitting on a loveseat, the victim sitting on his bed, and then two unknown people in the back corner of the room, and it seemed like everyone was getting along fine.

Miss Trifillis explained to us how her procedures are on finding competency to make sure someone can sign a document. And then the part that really stuck out to me was that as soon as the document was signed and notarized, the two gentlemen that were in the back immediately came and grabbed the paper and left the room according to Miss Trifillis.

Q.   Okay.  Now, when you were speaking with Miss Trifillis, she indicated that there were some series of questions she goes through with an individual before she accepts their signature as part of the notarization process?

A.   Yes.  Correct.

Q.   And one of these questions, is it correct that it was to ask what day of the week it is or what -- who the President is, and do you have a photographic identification on you, things of that nature?

A.   The three questions were who's the President, do you know where you are, and do you know what day of the -- what day it is.

Q.   And of those three questions, the only question that the victim or someone purporting to be the victim had trouble

answering was what day is it, correct, the calendar date?

A. As I recall it, it was he remembered the day of the week but not the date on the calendar.

Q. And this would have been October 31st, 2019 or Halloween; correct?

A. Correct.

Q. But he did not recall that it was October 31st at that time, the person who signed this document?

A. That's my understanding.

Q. When you were speaking with Miss Trifillis, did she describe the two individuals who she said were standing at the back of the room when this conversation was taking place?

A. Yes.

Q. How did she describe the two individuals in the back of the room?

A. One was a very tall, approximately six-foot-five-inch, slender black male. The second was a shorter, more average build black male.

Q. And were these two individuals introduced to her or did she know their names?

A. No.

Q. And are these two individuals the one who -- ones who set up this notary appointment based on your understanding?

A. So my understanding was that they had come down to inquire how to get something notarized earlier either that day or that

week, and then they were in the room when she was called up to that room for the notarization.

Q.  Okay.  Now, the -- Miss Trifillis indicated that the document that's Government's Exhibit 2 is in fact what she witnessed this person signing; correct?

A.  Yes.

Q.  However, Miss Trifillis told you that she never saw a photographic identification of the person who signed the name Antonio Williams on this document?

A.  Correct.

Q.  Now, did you talk to Miss Trifillis about her ability to identify the real Antonio Williams in terms of photographs that you may have shown her?

A.  Yes.  In order to see if she recalled Mr. Williams, we showed two photos.  Miss Trifillis was not able to identify the photographs of Mr. Williams due to the fact that the person she recalled in the room was much skinnier and also had short braids for hair, whereas in the photos the person was stockier and bald.  The photos we showed were taken, I think, six months prior, and I believe at that point Mr. Williams had been in the hospital approximately a month, a little over a month, and had been on a feeding tube.  So --

Q.  So the disparity in weight is neither here nor there; is that fair to say that it would be expected for someone to lose weight who is in the hospital with a serious injury?

A.   I think that's fair to say.

Q.   However, the hair being bald versus having hair, that's not something that would necessarily be affected by a hospital stay; is that fair to say?

A.   It's fair to say the hospital stay wouldn't.  But from June to October, I don't know if he groomed, let it grow out.

Q.   Correct.  However, there was also the real Antonio Williams has a distinctive tattoo on his forehead; is that correct?

A.   He does.

Q.   And what is that tattoo of?

A.   It looks like a money sign, a money symbol.

Q.   And did Miss Trifillis recall whether the individual who signed the affidavit had such a distinctive forehead tattoo?

A.   She did not recall a tattoo.

Q.   So, Agent Reder, turning more generally to your experience as a DEA agent and your training, is it fair to say that firearms are a tool of the trade of drug traffickers?

A.   That is extremely fair to say.

Q.   And would it be fair to say that a person with a known drug trafficking conviction, it would be reasonable that a community member might believe that individual had access or knowledge of firearms?

A.   Yes.

Q.   And would it be reasonable to say that that may inspire fear or trepidation in others to speak out against someone with

such a conviction and background?

A.   It could.

Q.   Has that been your experience in prior cases?

A.   It has.

           MS. ROSSI:   I have no further questions at this time.
Thank you.

           THE COURT:   Thank you.

           Mr. Clark.

                        CROSS-EXAMINATION

BY MR. CLARK:

Q.   Agent, I'm going to start where you just ended.

     You were asked about your experience and what might be
reasonable for folks to expect.  You dealt with Darias through
the course of your initial investigation in terms of observing
him, investigating him and so on; correct?

A.   Yes.

Q.   You learned about him and his daily habits and what he
does?

A.   Correct.

Q.   And just so we're clear, the judgment entry, he didn't
plead to anything other than marijuana; correct?

A.   That's correct.

Q.   His conspiracy was marijuana only?

A.   That's correct.

Q.   Okay.  Now, she asked you if it would be reasonable to

expect or somebody might be in fear or trepidation because of the nature of Darias's conviction.  Did you find anything in your investigation that would show that Darias is a threat or danger to anybody?

A.  Not of Darias having a weapon, but other co-conspirators in his case did.

Q.  Fair enough.  But not Darias --

A.  Not Darias.

Q.  -- which is what we're talking about?

A.  That's correct.

Q.  Okay.  When -- let me find my question here.

When you contacted the Detective Bohl, he didn't know about the affidavit, did he?

A.  I don't think he did.  I -- you know what, I'm not sure if he did or not.  I can't remember.  I want to say he did know about the affidavit because the state case was dismissed.

Q.  Okay.  And do you recall if the state case was dismissed based entirely on the affidavit or the fact that Mr. Williams after being subpoenaed and served with a subpoena twice to come to state court failed to appear?

A.  I don't know if that was -- I don't know.  I just wasn't there.

Q.  Okay.  Fair enough.

When you talked to Miss Trifillis, one of the things you wanted to ask her about was -- and this is my word, not

yours -- the environment in the room or the atmosphere when she went up to get this notary?

A. Yes.

Q. And I think the way you put it, did you see any signs that this was any kind of duress or coercion or anything like that. Do you recall her answer?

A. She said that it didn't appear there was any duress; that everyone seemed relaxed and getting along.

Q. Getting along well?

A. Yes.

Q. When she described how she identified the patient, because I think that's the label she was using was "the patient," do you recall how she described the way they identified patients in the hospital and why she did not get a photo ID?

A. So if I recall correctly, it's they're called to a room and they go to notarize for the patient in the room, so by assumption, then, is that they rely on the hospital records.

Q. And --

A. So whoever the patient is admitted to that room would be the person that they are there to notarize for.

Q. And the person who was in that room that Miss Trifillis notarized, that would also be the same person who a month before had looked at a photo array shown by the detective; fair?

A. I think that's fair.

Q.   So it would be the same person?

A.   I believe that's fair.

Q.   So if it's the same person, either Cincinnati Police had the wrong Antonio Williams identify somebody or they both have the right person in the hospital bed; fair?

A.   I think that's fair.

Q.   Okay.  You don't have anything based on all the work you've done investigating, and I think you've even got hospital records; did you get them that day?

A.   We have not gotten them yet.  We sent -- we gave a subpoena for the records, but those have not returned -- been returned.

Q.   Okay.  All that, do you have any reason to doubt it was not the Antonio Williams who is the named victim in the state court felonious assault that you originally told about is the person that Miss Trifillis notarized?

A.   Oh, I have no reason to doubt it.

Q.   Okay.  When you talked to Miss Trifillis and you -- she was relating to you the steps she took to determine if the person is competent, do you recall the discussion she had and she conveyed about the content of the affidavit?

A.   Yes.

Q.   And if I'm right, she said normally she doesn't even look at the content; fair?

A.   That's fair.

Q.   And I think the example she gave was if it said, "I saw

purple dinosaurs," and they signed it, she would notarize it 'cause her job is to just make sure the person is competent, aware and alert and knows that they're signing something; fair?

A.   Fair.

Q.   But that she also, because it was a short affidavit, she looked at it and it talked about the circumstances of Mr. Williams being hospitalized?

A.   Correct.

Q.   And she even, I think, recounted her conversation that she talked to him and said, "Are you sure" -- well, rather than me tell you, tell the Judge about the conversation she related to you.

A.   So the conversation was that she had actually reviewed the document itself and looked at Mr. Williams and said, "In reading this, it sounds like you're recanting your original statement to the police about who shot you."  And my understanding is Mr. Williams said, "Yes, that's right," and I think something to the effect of, "That's my cousin and we're good," and then she did the notary -- asked him those questions and had him notarize and sign.

Q.   Do you remember what she conveyed about why he had maybe misidentified him in the first place, because they were having an argument just before he got shot?

A.   They were having an argument before, and I think maybe something to the effect that that was the first name he thought

of when he woke up or when he was taken to the hospital.

Q.  When he came to?

A.  Yeah.

Q.  Did you get any other information from Miss Trifillis with respect to who was in that room in terms of other hospital employees, nurses, doctors, whatever, that were there to treat Antonio Williams at the same time she was there to get the notary?

A.  When she left the room, Miss Trifillis said she thought it was odd, and she actually approached one of the nurses that treated Mr. Williams and told that nurse that that was odd, what just had happened.

Q.  Okay.  But that step meaning she confirmed it was Mr. Williams with that nurse?

A.  I don't know if she confirmed it was Mr. Williams.  I just know she said it was what happened in the room was odd.

Q.  Fair enough.

        MR. CLARK:  I have no more questions for the agent. Thank you.

        THE COURT:  Thank you.

        Miss Rossi, do you have any follow-up?

        MS. ROSSI:  I do briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MS. ROSSI:

Q.  Agent Reder, I believe defense counsel began his

questioning asking you a little bit about the firearms that were involved in the underlying conviction; is that right?

A. Yes.

Q. And it's correct that the defendant's co-conspirators used firearms during the course of that conspiracy?

A. That's correct.

Q. Now, are you -- defense counsel also asked you questions about whether you observed any behaviors of the defendant that would be alarming or violent or something of that nature. Agent Reder, are you aware of the defendant's juvenile adjudication for aggravated menacing?

A. No.

Q. Were you aware of the defendant's juvenile arrest for robbery?

A. No.

Q. Or aggravated robbery?

A. No.

Q. Okay. Now, turning now to the questioning of Miss Trifillis, is it correct that Miss Trifillis told you and Mr. Clark that it appeared that the person signing the affidavit was hiding what the document was from others in the room?

A. Yes. At one point, like I said, there were three people sitting on the loveseat, was my understanding, that appeared to be like parents and either a cousin or girlfriend, and then the

other two gentlemen were on the other side of the room. And the way it was explained was that at one point I think it was the father or mother asked like, "Hey, what are you signing," and it was kind of sheltered from them, and they said they were just signing some hospital paperwork and not talking about what the document was.

Q. Okay. So this person -- at this point the person signing the document was hiding or was not being forthcoming regarding what the contents or nature of that document was to the three what appeared to be family members seated there, but is it correct that that individual who signed the document then provided it to the two unknown gentlemen who were standing in the back of the room?

A. That's fair.

Q. Okay. Now, this occurred, the signature occurred and notarization occurred October 31st, 2019. Are you aware of when Antonio Williams was discharged from the hospital?

A. It wasn't till late December just before Christmas.

Q. So the extent and nature of his injuries were such that he had to be hospitalized for two additional months after that signature?

A. It was either at UC or at I believe Drake rehab facility.

Q. Which is affiliated with UC which is where more serious patients with more serious injuries go to fully recover; is that right?

A.   Long-term rehabilitation, correct.

Q.   Thank you.

MS. ROSSI:  Nothing further at this time, Your Honor.

THE COURT:  All right.  Thank you.

Agent Reder, you may step down.

THE WITNESS:  Thank you.

Your Honor, would you like these (indicating)?

THE COURT:  You can just leave them right up there.
Thank you.

(Ms. Rossi and Mr. Clark conferring.)

THE COURT:  Miss Rossi, your next witness.

MS. ROSSI:  Yes, Your Honor.  At this point, the
government would like to call Detective Robert Bohl to the
stand.

THE COURT:  Detective, if you could stop and raise
your right hand.

(Witness complied.)

(Witness sworn by the courtroom deputy.)

THE WITNESS:  Yes.  Yes, I do.

THE COURT:  Have a seat and state your name and spell
it, please.

THE WITNESS:  Robert Bohl, B-O-H-L.

THE COURT:  Thank you.

Miss Rossi?

MS. ROSSI:  Yes.  Thank you, Your Honor.

ROBERT BOHL

DIRECT EXAMINATION

BY MS. ROSSI:

Q. Detective Bohl, if you could please briefly state your employment and how long you've been employed as such.

A. Cincinnati Police Department, 14 years, District 5 Investigative Unit.

Q. Detective Bohl, can you briefly describe your responsibilities as part of that division?

A. Just investigate various cases. I tend to focus on felonious assaults. We're each divided up by felonies, but that's what I focus on is felonious assaults.

Q. I'd like to turn your attention to a shooting that took place on September 19th of 2019. Were you involved into an investigation into a shooting on that date?

A. Yes.

Q. And did that investigation eventually lead you to arrest the defendant, Darias Jackson?

A. I signed warrants on him, yes.

Q. I'd like to talk a little bit about that shooting. Can you please describe for the Court where that shooting occurred and approximately when?

A. I was recalled in the middle of the night to respond to 1042 Groesbeck for a shooting. When I arrived on the scene, the uniform officers had already marked off multiple casings

and any other evidence we needed, so we photographed the scene, took some measurements, and then me and my partner responded up to UC Hospital to attempt to interview the victim.

Q. So 1042 Groesbeck Road, what is the nature of this address? Is it residential, is it a business?

A. It's an apartment building. And we found the casings and everything that were outside in the parking lot.

Q. And who lives at that apartment building who's relevant to this investigation?

A. Jalisa Harris who is the victim's now, I believe, ex-girlfriend.

Q. At the time -- well, let me back up. The victim, did you identify the victim as being Antonio Williams?

A. Yes.

Q. Now, were there reports of shots fired on that evening?

A. Yes.

Q. And when you arrived and saw the crime scene, was there blood that was indicated where the shooting had taken place?

A. Yes.

Q. Was there a firearm recovered?

A. No.

Q. And in the course of this investigation, was a firearm ever recovered?

A. No.

Q. How many casings were recovered from the scene?

A.   I believe it was nine nine-millimeter casings.

Q.   And that would be nine bullets; nine nine-millimeter bullets?

A.   Yes.  The casings, yes.

Q.   So you have identified the victim as Antonio Williams.  Was he transported to the hospital by ambulance or EMS or by somebody else?

A.   Private conveyance.

Q.   Do you know who?

A.   We were advised by the hospital staff that it was his girlfriend, Jalisa Harris.

Q.   I'm sorry, go ahead.

A.   And they held on to the vehicle, as they usually do, and held on to her as well until we arrived.

Q.   Okay.  And, again, that would be the girlfriend who lived at that address where the shooting took place?

A.   Yes.

Q.   What, if anything, did the victim say to his girlfriend when she transported him to the hospital?

A.   I can't recall off the top of my head what he said on the way to the hospital.  I can't remember exactly what she -- what he said to her.  I believe there was some talk about --

        MR. CLARK:  I'm going to object if he doesn't remember.  I mean, I know the Rules of Evidence don't apply, but we have to have some knowledge here.

THE COURT: Agreed.

Q. Did he say that -- did he identify the person who shot him during that trip?

MR. CLARK: I'm going to object to the leading.

MS. ROSSI: There's, Your Honor, there's no Rules of Evidence. If that refreshes his recollection about what was said.

THE COURT: That's fine. Sustained. Or, I'm sorry, overruled. Go ahead. You can answer.

A. Could you repeat that?

Q. During the course of either being transported to the hospital or while he was at the hospital, did the victim identify who shot him?

A. Yes.

Q. And who did he identify shot him?

A. I believe at the time it was just D.J.

Q. Okay. And during the course of your investigation, did you come to find that "D.J." is Darias Jackson?

A. Yes.

Q. Okay. Now, can you please briefly describe the nature of the victim's injury?

A. He was shot multiple times in the midsection. I don't exactly know how many times he was hit, but it was multiple times. Very serious injuries. He was -- when I got there, he was unable to make any statements due to being in surgery.

Q. And at what point were you able to finally talk to the victim?

A. It was at least a couple days later. I know the next day I responded out but he was still unconscious, and I don't remember exactly how many days but it was at least a couple days before I was able to talk to him about what exactly happened.

Q. Was it your understanding that he was in critical condition --

A. Yes.

Q. -- or it was a life-threatening injury?

A. Yes.

Q. Was it your understanding that there was a possibility he may not survive that injury?

A. Yes.

Q. So while you were -- did you continue to investigate while the victim was unconscious?

A. Yes.

Q. Did you receive multiple Crime Stoppers reports?

A. I did.

Q. Could you please describe for the Court what those Crime Stopper reports told you about who had shot Mr. Williams?

A. The Crime Stopper tips, it was at least two that said it was Darias Jackson that shot him, and one of those Crime Stopper tips actually came with a photo as well.

Q.   Were there three Crime Stopper tips in total?

A.   Yes.

Q.   And you said two specified it was an individual named Darias Jackson.  What did the third Crime Stopper tip say?

A.   The third Crime Stopper tip said that Jalisa Harris had video of the incident from her apartment building or from her apartment.

Q.   So going to the two that identified the shooter as Darias Jackson, you said that there was a picture included; is that right?

A.   Yes.

Q.   And was the picture that was included in fact of the defendant who's seated here in court today?

A.   Yes.

Q.   And were the descriptions given in terms of what Darias Jackson looked like, are they consistent with the individual seated here in court today?

A.   Yes.

Q.   Just for the record, can you briefly describe what a Crime Stopper tip is, what the nature of Crime Stoppers is?

A.   It's an anonymous tip.  People can call in and just give anonymous info that helps us identify a suspect, and they can also -- if it helps us lead to a suspect, then it can -- they can get paid for that information.

Q.   Is there a reason why someone may want to anonymously

report a crime?

A.   Not that I can -- not that I'm aware of.  I mean --

Q.   Is it fair to say that if someone is reporting a violent crime, they might fear reprisal if they were --

MR. CLARK:  I'm going to object to the leading.

THE COURT:  Overruled.

Q.   Is it fair to say that someone may want to anonymously report a crime because they are scared of what would happen to them if they found out that they were a snitch?

A.   Yes.

Q.   Okay.  Now, you mentioned that there was a video that was mentioned in this -- one of the three anonymous Crime Stopper reports; is that right?

A.   Yes.

Q.   And it was allegedly taken by the victim's girlfriend, Jalisa Harris, at 1042 Groesbeck Road?

A.   Yes.

Q.   Were you able to eventually obtain this video?

A.   I was.

Q.   And were you able to view this video?

A.   I was.

MS. ROSSI:  Your Honor, at this time I'd like to play Government's Exhibit 3 and have the witness identify it as the video that he obtained.

THE COURT:  Sure.

Miss Rossi, how long is the video?

MS. ROSSI:  Three or four minutes, Your Honor.

THE COURT:  Thank you.

MS. ROSSI:  Okay.  With the Court's permission, I'm going to hit "play" at this time.

THE COURT:  Hold on one second.

Mr. Clark, do you have a good view?

MR. CLARK:  Yes.

THE COURT:  Okay.  Go ahead.

MR. CLARK:  Thank you.

(Government's Exhibit 3, a video, was played.)

(Video stopped.)

Q.  Detective Bohl, based on your investigation, were you able to identify the two individuals depicted in this individual as Darias Jackson and the victim, Antonio Williams?

A.  Yes.

Q.  And when you received this video through Crime Stoppers, were you able to confirm that the location of the video was in fact in front of 1042 Groesbeck Road?

A.  I didn't receive it through Crime Stoppers.  I received it through e-mail.  But, yes, I was able to identify just the parking lot.  That area appeared to be the same location of the shooting.

Q.  And were you able to identify one of the cars depicted in the video as being a car that was at the crime scene that

night?

A.  Yes.

Q.  Now, I know in the courtroom we were able to hear some shouting and yelling.  Can you tell the Court if you've been able to hear any of the words that were said in your previous investigation into this video?

A.  Yes.  It appeared they were arguing about money.  You can hear money involved several times.  And at one point you hear one of the individuals say --

MR. CLARK:  I'm going to object.  It speaks for itself.  I mean, if you can hear it, you can hear it.  I don't think you need to be told what you hear.

MS. ROSSI:  Your Honor, this goes to the detective's investigation and knowledge.  They have the special equipment to hear audio louder than what we have in the courtroom today.  The Rules of Evidence don't apply.  The officer is under oath.

THE COURT:  All right.

MR. CLARK:  Excuse me, has that audio been -- has that been modified, then?

MS. ROSSI:  No.  Are you asking me if this video has been modified?

MR. CLARK:  Yeah.

MS. ROSSI:  No.  Not by me.

Q.  Detective --

A.  No, I did not modify it at all.

THE COURT: All right. Go ahead. You can answer.

A. At one point I heard one of the individuals say, "How are you going to shoot me if you don't have a gun?"

Q. Now, okay. So I would like to go back now to this investigation that you were conducting, including this video, while the victim was unconscious. Eventually the victim did in fact regain consciousness, he did live; correct?

A. Yes.

Q. Now, approximately when were you able to speak to Mr. Williams?

A. Again, I don't know the exact date of when I actually spoke to him, but it was several days later when I was able to get a statement from him on exactly what happened.

Q. And what did the victim tell you happened?

A. He stated that he was having a verbal altercation with Mr. Jackson over the phone, at which point Mr. Jackson responded to 1042 Groesbeck and shot him.

Q. Okay. Did he say whether he had known Darias Jackson prior to the shooting?

A. He said he's known him for ten years.

Q. Did he say that he had any doubt in his mind regarding the identity of the shooter?

A. He did not have any doubt.

Q. Did you receive during the course of your investigation any Crime Stopper tips or tips of any nature identifying someone

else as the shooter?

A. No.

Q. So the only person the victim or anybody else identified as the shooter is in fact the defendant who's seated here in court?

A. Yes.

Q. When you were speaking with Mr. Williams after he identified Darias Jackson as the shooter, did you conduct a photo lineup with Mr. Williams?

A. Yes.

Q. And did he identify anyone in that photo lineup as the shooter?

A. Just to be clear, I did not. I created the photo lineup, and I had another officer administer it. It's called a blind administrative lineup. He administered the lineup, and, yes, Mr. Williams picked out Mr. Jackson as the shooter.

Q. In the procedure that you've described, the blind identification, that's in order to not suggest --

A. Right. That's correct.

Q. -- to the person who may or may not be in the photo lineup; correct?

A. Yes. The other officer has no idea who the suspect is.

Q. Okay. Thank you.

So in the course of your conversation with Mr. Williams, did he indicate what he and the defendant were arguing over

that preceded the shooting?

A. He -- over money.

Q. And that's consistent with what you --

A. Yes.

Q. -- heard in the video?

A. Yes.

Q. Now, you've been in court today while we've been discussing an affidavit that was allegedly signed by the victim, Antonio Williams; correct?

A. Yes.

Q. And this affidavit was filed as part of the state case?

A. Yes.

Q. Can you please tell the Court what the circumstances were surrounding the filing of that affidavit in the state case?

A. As far as like who filed it?

Q. Correct.

         MR. CLARK:  I'm going to object unless he has firsthand knowledge.  I don't know how he could.  I mean, again, I know the Rules of Evidence don't apply, but we have to have some reliability here.

Q. Are you aware that the state case was dismissed?

A. Yes.

Q. Are you aware that there was an affidavit filed in the state case that caused the case to be dismissed?

A. Yes.

MR. CLARK: I'm going to object to the cause.

THE COURT: Sustained. You can ask how he knows what he knows and what in fact it is that he knows.

Q. Have you spoken to the state prosecutor in the case?

A. Yes.

Q. And did the state prosecutor tell you why the case was dismissed?

A. Yes.

Q. And what was that reason?

A. He said because of the affidavit and that the victim was not in court.

Q. Okay. So it was not dismissed because the state prosecutor had any personal contact with the victim or anyone else; correct?

A. That's correct.

Q. All right. Now, were you able to make contact with Antonio Williams at some point after the state case had been dismissed?

A. It was actually prior to the case, state case, being dismissed. I talked to him on the phone.

Q. Okay. And what did Mr. Williams tell you on the phone?

A. He stated that he does not remember signing the affidavit. He said he was under narcotics and did not remember it, and he still wanted to proceed with the charges.

Q. Okay. Has the victim, Mr. Williams, at any time ever told you that he did not want to proceed with the charges?

A.   No.

Q.   Has he ever told you that someone other than Darias Jackson shot him?

A.   No.

Q.   Has anyone told you that anybody apart from Darias Jackson is responsible for the shooting this night?

A.   No.

Q.   Now, just to make things clearer, you're aware that the purpose of today's hearing is just to establish probable cause for a federal supervised release violation?

A.   Correct.

Q.   You're aware that this hearing has nothing to do with the state charges or -- of attempted murder or felonious assault or anything of that nature?

A.   Correct.

Q.   And so is it fair to say that your involvement in the state investigation is still ongoing or may evolve?

A.   That's correct.

Q.   And have you told me every single fact and detail you know about the investigation, or have you just answered the questions I've asked you?  In other words, have you limited your answers to what I'm asking?

A.   No.  I -- anything I have, you've been made aware of.

Q.   Right.  So but I may have asked you some specific questions that are just not relevant right now; correct?

A.   Correct.

Q.   Okay.

A.   Yes.

         MR. CLARK:   I'll stipulate to that.

Q.   Okay.

         MS. ROSSI:   Nothing else at this time.

         THE COURT:   Thank you.

                      CROSS-EXAMINATION

BY MR. CLARK:

Q.   Detective, you said you were not the one who conducted the photo lineup; fair?

A.   Correct.  Yes.

Q.   You weren't at the hospital that day?

A.   I was at the hospital.  I just -- I step out of the room.

Q.   Okay.  You went in the room.  How do you know that who the uniformed officer administered the lineup to?

A.   I went in the room and spoke with Antonio.

Q.   How do you know it was Antonio?

A.   Because I had speaken to -- spoken to him previously.

Q.   How did you identify him as Antonio Williams?

A.   Through a picture.

Q.   How did you identify that person in the bed?

A.   It was the same person I've seen in the picture prior to.

Q.   And was that the same one that was in the hospital from the date he went in until December 23rd?

A.   Yes.

Q.   Were you aware of any other Antonio Williams in University Hospital at that time?

A.   Not that I was aware of, no.

Q.   Okay.  When Antonio looked at this photo lineup, how many days after he got shot was this?

A.   I believe it was two days -- or, I'm sorry, it happened on the 19th.  We showed it to him on October 2nd.

Q.   Okay.  What steps did you take to make sure he was aware of his circumstances and what was going on at the time?

A.   I go in there and I just speak to him.

Q.   I didn't ask what you generally do.  What did you do with Mr. Williams that day to confirm he was clearheaded?

A.   Just asked him if he was ready to view a photo lineup.

Q.   Okay.  Did you ask him what day of the week it was?

A.   I did not.

Q.   Did you ask him where he was?

A.   I did not.

Q.   Did you ask him who the President was?

A.   No.

Q.   Did you do anything to determine if he was functioning beyond his eyes were open and he could talk to you and he was aware of what he was doing?

A.   They read some instructions for the photo lineup, and they just have to sign it and say they're aware of the instructions.

Q.  Right.  But what steps did you take to make sure he understood those?

A.  The officer that reads them, he reads them to him and then he has them sign them just to make sure he understands what's going on.

Q.  What steps did you take to make sure he understood them?

A.  Past that, nothing.

Q.  Okay.  Did you talk to a nurse that day?

A.  I can't recall.

Q.  Did you find out what drugs he was on?

A.  I do not recall.

Q.  Did you find out if he was on any type of narcotics?

A.  I do not recall.  I don't know if they can release that information to me.

Q.  Okay.  So as you sit here, you can't tell this Judge that Antonio Williams, at least that you identified, was clearheaded when he made that identification with the officer and the photo array?

A.  In my mind, he was clearheaded, but I'm not a doctor.

Q.  Okay.  And you didn't do anything other than ask him to look at pictures; right?

A.  No.  We asked him to read -- we read him the guidelines --

Q.  Right.

A.  -- and sign those and understand.

Q.  The rules don't require any response from him, do they?

A.   Yes.   They --

Q.   There's 11 bullet points and --

A.   Yes.

Q.   -- you tell him I'm about to show you a series of photographs?

A.   Right.

Q.   The person may or may not be in here?

A.   Right.

Q.   People's looks can change over time?

A.   Yes.

Q.   It's just as important to exclude people as it is to pick a guilty party?

A.   Yes.

Q.   All that?

A.   Yes.

Q.   And they don't have to answer any of that till the end where you have them sign saying that you read that to them; correct?

A.   Individually do they have to answer them?  It depends on who's showing them.  When I show them, I don't typically ask them to answer each individual question yes or no.

Q.   Okay.  So the person that you read those to that day or that you went in with the uniform to read them to, you didn't take any steps to find out if his mind was functioning clearly?

A.   Again, I didn't read those to him.  I stepped out of the

room once they start that process.

Q.  Well, this is your investigation; correct?

A.  Yes.

Q.  You're the case agent?

A.  Yes, sir.

Q.  It's your case?

A.  Yes.

Q.  You collect the evidence; you interview the witnesses; you file the charges?

A.  Yes.

Q.  And you want to do the job right?

A.  Yes.

Q.  So you didn't take any steps to find out if the witness who was going to look at the photo lineup was clearheaded?

A.  In my mind, he was clearheaded.

Q.  Okay.  Tell me what you did and what his response was that established he was clearheaded.

A.  His state of mind that day, he seemed he was very well spoken; he was able to answer questions.

Q.  What questions?

A.  How he was feeling that day and just general questions like that.

Q.  Okay.  But nothing that made him think really; fair?

A.  I don't recall our whole conversation.  It was not recorded.

Q. It's fair to say you don't have any medical training?

A. That's correct.

Q. You already said you're not a doctor?

A. Right.

Q. The officer who showed the lineup, photo lineup, you don't know if he has any medical training?

A. Not that I'm aware of.

Q. Okay. All right. Let's go back to when you talked to Mr. Williams about this affidavit. He told you he didn't sign an affidavit?

A. He said he does not remember signing that affidavit.

Q. Okay. Does he remember you showing him the photo lineup?

A. He said he remembered it but he would like it, when it comes time for court, he would like to review it before showing -- before; but he said he remembered signing it or looking at the photo lineup.

Q. And you said he was seriously injured?

A. Yes.

Q. Life-threatening injuries?

A. Yes.

Q. You thought he might die?

A. Yes.

Q. Why wasn't Homicide notified?

A. They typically aren't notified in --

Q. Doesn't the policy require you to notify them whenever

death is likely or imminent?

A.  I'd have to see exactly what his injuries were.  It did not level -- rise to the level that we thought we needed to notify Homicide.  He was still -- we go by the doctor's advice and if he is going to survive or not, and they told us that he's -- he was very critical but they thought he was going to survive.

Q.  He got shot nine times in the midsection?

A.  I don't know how many times exactly.  I know we found --

Q.  More than once?

A.  Yes.

Q.  Was in surgery when you got there initially to talk to him?

A.  Yes.

Q.  Was unconscious for at least a day after that when you went back?

A.  Yes.

Q.  Was apparently two or three days later still in ICU when you talked to him?

A.  Yes.

Q.  Hooked up to all kinds of machines?

A.  Yes.

Q.  And you didn't notify Homicide?

A.  That is not my job actually.  It's above my level.

Q.  Understood.

All right.  Let's talk about the shooting.  You said you got recalled.  What do you normally work, seven to three?

A.   At that time I was working 11 a.m. to 7 p.m.

Q.   11 a.m. to 7 p.m.  And this was in September, so those hours it was all daylight; correct?

A.   That would be correct, yes.

Q.   And you got recalled at what time?

A.   I can't recall off the top of my head.

Q.   What time did you get to the scene?

A.   I do not recall off the top without looking at the report. And let me just --

Q.   Do you have your report?

A.   I do.  It's over there (indicating).

        MR. CLARK:  Judge, can he get his report?

        THE COURT:  Miss Rossi, do you have it?

        MS. ROSSI:  If I may approach the witness to confirm that this is his report.

        THE COURT:  Um-hmm.

    (Ms. Rossi conferring with Mr. Clark.)

        MR. CLARK:  That should work.  I was thinking more like the incident report, but that might work.

        THE WITNESS:  Well, that wouldn't have the time I was recalled.

    (Ms. Rossi handed a document to the witness.)

A.   I do not have the time in here when I was recalled.

Q.   All right.  So you don't have any idea when you got to the scene or when this happened.  When did the shooting happen?

A. I'd have to verify, look at the report for that to get the exact time.

Q. Do you recall how long you had been at home?

A. I do not. Some days I do flex my hours where I may have been at home earlier that day. So --

Q. Was it dark when you got there?

A. Yes, it was.

Q. Okay. Had it been dark for a while?

A. Yes.

Q. So is it fair to say this shooting occurred after dark?

A. I would say so.

Q. Okay. The video that we saw, that we just played and the Magistrate looked at, what time of day was that video taken?

A. I'm not sure.

Q. Did you ever learn what time of day it was taken?

A. No, because there's no time stamp on it.

Q. All right. Do you even know what day it was taken since there's no time stamp on it?

A. I can't verify that since there's no time stamp and I don't have access to the video to say.

Q. Okay. So you don't know if it was even taken the same day of the shooting?

A. I have no time stamp to prove that it was other than how it was provided to me.

Q. Okay. So as you sit here, though, just so I'm clear, your

answer is you don't know when that -- you can't establish when that video was taken; fair?

A.   I can't say exactly what time the video was taken.

Q.   Okay.  When you talked to Mr. Williams, what did he tell you about the confrontation we saw in the video?

A.   He said they argued.

Q.   On the phone?

A.   On the phone, and then he responded there to confront him.

Q.   You said he came and shot him there.  Your testimony on direct was:  "We argued on the phone, and then he came and shot me."

A.   Confronted him there, and then he was shot.

Q.   The shooting's not on the video?

A.   Correct.  It cut off.

Q.   There's no shots on the video?

A.   Correct.

Q.   There's no sounds that sound like shots on the video?

A.   Correct.

Q.   And I'm curious, how did you identify anybody in those videos?  Did you look at that video and go, gee, that's Darias Mitchell and that's Antonio Williams?  Can you tell by looking at that video that that's Darias sitting there?

A.   Darias Mitchell or Darias Jackson?

Q.   Darias Jackson.

A.   Looking at the video and looking at their body type and

their appearance, it appeared to be both the victim and the suspect.  But it is not -- it's not me to you looking at you. It was just another piece in the pie for me to --

Q.   Well, but that's different.  You told the U.S. Attorney you identified that as Darias Jackson.

A.   I, in my opinion, it was Darias Jackson.

Q.   Is that based on his body type?

A.   It's based on the video, what he looks like in the video, the description I had of him, pictures I had of him; I matched them both up.  To me, it looked like him and the victim.

Q.   Okay.  But you can't look at that video and see the face of this gentleman sitting right here (indicating), can you?

A.   I could -- to me, I could see -- I could see enough of him to determine that I believed it was him.

Q.   You believed it was him?

A.   Yes.

Q.   Okay.  I'm going to ask you a silly question.

A.   Okay.

Q.   In your 14 years as a Cincinnati Police officer, you didn't say how many years you've been a detective?

A.   Been about four years.

Q.   Four years?

A.   Um-hmm.

Q.   Have you ever made a mistake?

A.   It's fair to say everybody makes mistakes.

BOHL - CROSS

Q.   Okay.  And Mr. Williams tells you he didn't sign an affidavit, but you would agree that we have an affidavit that bears Antonio Williams' signature; fair?

A.   There is a signature on there, yes.

Q.   Okay.

A.   I wasn't there to see it so --

Q.   I understand that.  But you weren't there to see the photo lineup either.  You were out of the room; right?

A.   That's correct.

Q.   So you don't know what happened during that exchange either, do you?

A.   I trust my fellow officer that I was in the Academy with that he is going to go through proper procedure and have him sign that.  So --

Q.   Okay.  Did you trust him also to make sure that Mr. Williams was consciously aware of what was going on?

A.   I trusted that he would not do a photo lineup if he thought he wasn't of sound mind.

Q.   Okay.  And you trusted your investigation to him to do that?

A.   Yes.

Q.   Okay.  Now, when we talked about the state case being dismissed, you said -- you tried to get away with it was dismissed because of the affidavit.  But it was also dismissed, the prosecutor told you, because the victim didn't show up?

Correct?

A. I said it was because he did not show up and he -- and the affidavit.

Q. He didn't show up not once, but he failed to show up twice; correct?

A. The first time he was notified, he was still in the hospital and unable to make it to court. And the -- so the first time, he was unable to make it to court due to still being in the hospital under treatment.

Q. Okay.

A. So the second time he did not show up he -- when I talked to him on the phone, he was not made aware of the date of the court, of the court case.

Q. I'm just curious, how did you talk to Mr. Williams on the phone?

A. I attained a number from his birth mother that was -- that was his brother's.

Q. And how did you identify Mr. Williams?

A. I spoke to him on the phone. I've spoken to him before. But I'm --

Q. How many times have you spoken to him on the phone?

A. None, other than that day.

Q. Okay. So you don't know what his voice sounds like on the phone except for that day?

A. That's correct.

Q.  Have you ever interviewed a suspect or witness and recorded it?

A.  Yes.

Q.  Have you ever had the occasion to go back and listen to it and realize you sound different recorded than you did --

A.  Yes.

Q.  -- than you think you do in real life?

A.  Yes.

Q.  All right.  So when you said you talked to Mr. Williams on the phone, you talked to somebody who claimed to be Mr. Williams?

A.  That's correct.

Q.  But you have no way of knowing?

A.  Not without seeing him face to face.

Q.  Okay.  The U.S. Attorney asked you why would somebody call Crime Stoppers and do it anonymously, and at first, you didn't give her an answer she liked because you couldn't think of any reason; and then she gave you one -- I'm going somewhere with this -- she said is it so they don't want to be labeled a snitch, okay; right?

A.  I misunderstood the question.

Q.  Okay.

A.  So that was my fault.

Q.  That's all right.

A.  I misunderstood the question.  But, yes, people will call

in anonymously in fear for retaliation.

Q.  Okay.  Isn't another reason that people will call in anonymously is to try to get somebody in trouble who maybe didn't do anything?

A.  I don't know of any instances.  It may have happened in the past.

Q.  And one of the things about Crime Stoppers that is -- kind of cuts both ways is it is anonymous; correct?

A.  Correct.

Q.  You have no way to go back and check, I'll say, the providence or motive of whoever the tipster is; fair?

A.  They don't provide a number for me, to me.

Q.  And the way they do anything is anonymously with a number, and I think you alluded to if a tip pans out, they can get cash?

A.  Correct.

Q.  So I think given 14 years as a police officer, some people might give tips just to try to get money, whether they're valid or not; fair?

A.  I'm sure in some people's minds they might do that.

Q.  Okay.  You said that evidence was recovered at the scene that night.  Do you remember how long you were at the scene that night?

A.  Under an hour.

Q.  Okay.

A. From when we arrived to when we left, I'd say it was under an hour.

Q. All right. And then from there, you went to the hospital?

A. Correct.

Q. Do you remember what time you got to the hospital?

A. I don't.

Q. But it was still dark out?

A. Yes.

Q. Okay. Did you listen to the 9-1-1 calls?

A. I did not.

Q. Do you know how it got reported?

A. He showed up at the hospital. We received -- we received shots fired runs. Officers responded there. They didn't find the victim, but as they were there, or I believe right as they arrived, there was a report from UC Hospital that a victim had arrived.

Q. Okay. When you collected the casings, I know you told the government that you didn't find a firearm?

A. Correct.

Q. Did you do any testing on the casings such as DNA or fingerprints?

A. No. We typically don't do that.

Q. Okay. So if there was DNA fingerprints that had Mr. Jackson's connection, we don't know that?

A. My understanding it would be destroyed in -- in the

shooting a gun, anything like that would be destroyed.

Q. But you don't know until you ask; right?

A. No.

Q. All right. We talked about that.

MR. CLARK: Can I have one second, Judge?

THE COURT: You may.

(Mr. Clark conferring with the defendant.)

Q. You talked to Mr. Williams, and you said that he told you that they had a fight on the phone?

A. Correct.

Q. I'm going to ask did you find out if it was a cell phone or a land line? Did you find out the phone number?

A. I did not.

Q. When you got a subpoena for Mr. Jackson's cell records, did you see his cell records confirm what Mr. Williams told you?

A. I don't believe I got a subpoena for his cell records because I didn't have a number for him.

Q. All right. When you got Mr. Williams' cell records, did that confirm what he told you?

A. I did not get his cell phone records for him.

Q. You didn't get his cell -- so we can't corroborate that part either?

A. No. Correct.

MR. CLARK: I have nothing else for him.

THE COURT: Thank you.

MS. ROSSI: Just a few follow-up questions, Your Honor.

REDIRECT EXAMINATION

BY MS. ROSSI:

Q. Detective Bohl, defense counsel asked you some questions about the providence of this cell phone video that we viewed. Now, it was not just a copy of this video that landed in your in-box without any context that led you to believe that it depicted the victim and the defendant, you actually were able to view this video and take into account the other tips that were brought in with it; correct?

A. Correct.

Q. And you were able to go to the scene and look at the angle the video was taken at and see that it could in fact be taken from 1042 Groesbeck where the victim's girlfriend lived?

A. Correct. And the video was e-mailed to me from a relative of Mr. Williams, and in that e-mail, it was forwarded from Jalisa Harris.

Q. Okay. So we know it came from the victim's girlfriend?

A. Yes.

Q. It was purported to be taken just before the victim was shot?

A. Correct.

Q. And the car that was in the video was in fact parked there the night of the shooting?

A.   Correct.

Q.   Which you personally observed?

A.   Yes.

Q.   And confirmed?

A.   Yes.

Q.   Okay.  Now, Mr. Clark asked you some questions about, you know, maybe someone would report something to Crime Stoppers to get a monetary reward.  Does somebody get a reward just for making the report?

A.   No.

Q.   In fact, doesn't someone have to be convicted in order for money to be disbursed?

A.   There has to be an arrest made.

Q.   Okay.  And is that automatically done for whoever puts in a tip, or is there any other process or procedure that goes into that?

A.   They -- I don't know exactly what their process is.  I do know that I received a call from Crime Stoppers asking me if any of these tips led to the arrest and which ones it was.

Q.   Okay.  But at any rate, you didn't receive any other tips that somebody else was involved in this shooting?

A.   No.

Q.   Okay.  Now, Mr. Clark asked you some questions about the phone call in which you spoke to the victim, Mr. Williams?

A.   Yes.

Q.   Now, over the course of your career and also just through common sense and experience, you've spoken to many people in person and then had conversations with them on the phone; correct?

A.   Yes.

Q.   Now, throughout your life -- and let me ask, how old are you, sir?

A.   38.

Q.   And you've probably spoken to people on the phone and in person, you know, thousands and thousands of times; right?

A.   Yes.

Q.   Would you say that you are confident that the person you met in the hospital that was Mr. Williams and the person you spoke to on the phone were -- had the same voice and were in fact the same person?

A.   Yes.

Q.   Okay.  Thank you.  Nothing further.

THE COURT:  Thank you.  You may step down.

(Witness complied.)

THE COURT:  Miss Rossi, do you have anything else to present to the Court?

MS. ROSSI:  Your Honor, I'll call Miss Trifillis, the notary, at this time.  I believe she's in the courtroom.

THE COURT:  Ma'am, if you could raise your right hand to be sworn, please.

(Witness complied.)

(Witness sworn by the courtroom deputy.)

THE WITNESS:  I do.

THE COURT:  Be seated and spell your name for the record, please.

THE WITNESS:  Jeanette Trifillis.  Last name is spelled T-R-I-F-I-L-L-I-S.

THE COURT:  Thank you.

MS. ROSSI:  Your Honor, if I could just have one moment.

THE COURT:  You may.

MS. ROSSI:  Thank you.

(Pause in proceedings.)

MS. ROSSI:  Thank you for your patience, Your Honor.

JEANETTE TRIFILLIS

DIRECT EXAMINATION

BY MS. ROSSI:

Q.  Thank you, Miss Trifillis.

Miss Trifillis, you've heard a lot of testimony today about this meeting that you had with Agent Joe Reder with the DEA and the defense attorney, Mr. Jay Clark.  At the outset, I just want to give you the opportunity, did you hear anything today that was inaccurate or that differed from your memory?

A.  I did.  When we had the meeting down in our office when they both came in, they misquoted me for something that my

manager had said about the reading the document and everything. I'm actually pretty good about reading the document before I notarize it for someone. I come back and say, "Do you realize" -- like if it's general financial power of attorney or whatever it is, "Do you realize by signing this today, you can give this person," blah, blah, blah, and I just kind of make sure that the person signing is aware of what they signed today.

Q. Okay. Now, we've heard a lot about this, and I'm just going to kind of ask you some specific questions. Please feel free to jump in if you think I'm misunderstanding what transpired.

A. Okay.

Q. But is it fair to say that you believed based on the normal procedure of the hospital that the person in that patient bed was Antonio Williams, the patient?

A. Yes.

Q. Now, are you prepared to say here today under oath that you are 100 percent certain that that person was in fact Antonio Williams in real life?

A. No.

Q. And is that partly because of the suspicious circumstances surrounding this notarization?

A. No, because we kind of do things a little bit differently in the hospital. Instead of identifying with a photo ID as far

as like a driver's license or passport, something like that, we go off of the hospital wristband. And then, you know, I come in, do my general notary thing, ask my questions, verify that as the ID.

Q. Right. So what makes you say that you're not prepared to say that that was the correct individual?

A. Two things. I did not have a actual photo identification. And then the second thing being that the photograph that they showed me when they came down to interview me separately for this event last Friday, I think it was, I could not identify him a hundred percent that it was him in that photograph.

Q. Okay. And it was your understanding that the photographs you were shown were of the correct Antonio Williams, the one that they were actually concerned with?

A. That is correct.

Q. Okay. Now, you have a pretty vivid memory of this event even though you do many of these a month?

A. Yes.

Q. Approximately how many notarizations do you do a month at the hospital?

A. Maybe 40, 50.

Q. So this one stands out in pretty clear memory it seems?

A. Yes.

Q. And is that because it was unusual?

A. Absolutely, yes, because of the content of the document.

Q. And is it unusual to have somebody else come in with a document, arrange for it to be notarized, and then take that document and leave?

A. So maybe take the document and leave. But, no, sometimes we'll have a family member come down and say they have healthcare power of attorney or something of that such and, you know, we want to try to get a notary. And we just say, well, we can normally respond shortly; instead of here in the office, you can just call from the room, and we usually try to have somebody up there within 30 minutes to an hour so it's pretty quick.

Q. Right. So that makes sense if a family member wanted to have the power of attorney of a loved one who needs medical treatment; that's totally expected?

A. Yes.

Q. And that they may then need to take that document to a lawyer's office or to a courthouse or something of that nature; that's totally normal?

A. Yes.

Q. Now, is it normal for a criminal case where someone's recanting a previous statement saying someone shot them for two unknown people whose connection to this patient's unclear, is it normal for them to then immediately take that document and leave?

MR. CLARK: I'm going to object to foundation for this

because if she's talking about historically over her time at the hospital with 40 or 50 a month, we haven't established this has ever happened before.

MS. ROSSI: That's what the question is, is this normal.

MR. CLARK: No. She's never established she's signed one where somebody recanted before.

THE COURT: All right. The objection is overruled. But if you could ask a more focused question, please.

MS. ROSSI: Yes, Your Honor.

Q. Now, have you had instances where people have recanted previous statements in a criminal context?

A. No.

Q. So this is the first one?

A. Yes.

Q. Okay. And in your mind, is it unusual for two people who have not been introduced to you, whose relationship is unclear, to then take that document from the room?

A. That is actually at the time that it raised suspicion to me when so quickly after I stamped it and I handed it back to the patient, they received it and left the room.

Q. And is it accurate that the other people in the room who appeared to be relatives of this person, they were not aware of the contents of this document?

A. Yes. That is true.

Case: 1:12-cr-00095-MRB Doc #: 401 Filed: 02/24/20 Page: 60 of 83 PAGEID #: 1844

Q.   Okay.

MS. ROSSI:  Now, Your Honor, I'm going to approach the witness with exhibits that have been marked for identification purposes as Government's Exhibits 3 and 4.  These were previously shown to the Court and defense counsel at the detention hearing.  If I may approach, Your Honor.

THE COURT:  You may.

Thank you.

MS. ROSSI:  Your Honor, may I also take Government's Exhibit 2 off the witness stand to turn it to a page for the witness?

THE COURT:  You may.

MS. ROSSI:  And for the Court and Mr. Clark and the record, I'm turning it to the last page, Government's Exhibit 2 which is the signed affidavit.

Q.   Now, Miss Trifillis, I'd like to turn your attention to Government's Exhibit 2.  That's the document that was on the table that I turned to the last page.  Now, that's the document that you notarized; correct?

A.   Yes.

Q.   And that's you see that signature that says "Antonio Williams"?

A.   Yes.

Q.   Now, I've also handed you Government's Exhibits 3 and 4, and I would like to let you have a moment to take a look at

them and identify where on those exhibits the signature "Antonio Williams" is located. And let me know if you need assistance with that.

MR. CLARK: Your Honor, I'm going to object only because I don't know that this witness ever has any contact with these documents. I don't know the relevancy of showing her documents she has no knowledge of. If she's going to submit them for the sake that the signature on the affidavit looks different than this, I don't think Miss Trifillis is in a position to do that. That's your job.

MS. ROSSI: Your Honor, laypeople all the time give their opinions as to whether handwriting matches. That's not something an expert witness is required.

MR. CLARK: Handwriting is not science anyhow.

THE COURT: I understand what everyone's position is, but as we all know, the Rules of Evidence don't apply. So you can ask her.

MS. ROSSI: Thank you, Judge.

Q. Now, are you able to locate the signatures on Government's Exhibits 3 and 4 that say "Antonio Williams" --

A. Yes.

Q. -- or would you like me to approach?

A. No. I have them.

Q. Now, in your opinion, do you have -- do you have an opinion regarding whether the signature on the affidavit that you

notarized, does that look like a clear match to you with Government's Exhibits 3 and 4?

MR. CLARK: Your Honor, I'm going to object to the relevancy. It doesn't matter. I mean, we're wasting time. I know the Rules of Evidence don't apply, but come on.

THE COURT: I understand, and I can compare them for myself as well, but she can ask the question.

MS. ROSSI: Thank you.

A. So, honestly, when I did the affidavit -- and I forget what your exhibit number is for this one. Exhibit Number 2.

Q. Um-hmm.

A. When he signed the affidavit, I was kind of taken that he wrote out and not an actual signature. So I asked him, "Is this your signature, how you sign everything?" I don't know level of education, anything like that. He responded, "Yes, that is my signature." And I said, "Okay."

If you're asking me to compare it with Government Exhibit 3, that is also in print and not a signature. And the A's are looking a little similar.

MR. CLARK: I'll withdraw my objection.

A. My signature was -- yes. I'm definitely not a, you know, expert in this, but I would say that it's close enough that, yes.

Q. It doesn't immediately raise suspicion in your mind?

A. That's correct. That's correct.

Q.  Do you think that it looks like the one that you were notarized is somewhat different in terms of its legibility or clarity?

A.  It is different.  The one that I notarized is definitely more sloppy.

Q.  Sloppy.  And we've already established that you're not a doctor and you don't talk to doctors before you let people notarize things?

A.  Correct.

Q.  So in your opinion, is it possible that someone's signature may appear differently because they are either incapacitated due to physical limitations of an injury or because of some medications they may be on that they are -- that could affect their ability to sign something?

A.  Absolutely.  As a notary --

Q.  And is that something that you've actually observed?

A.  Yes.  As a notary in the hospital, I can say that I've seen signatures vary because of injuries or, you know, they can still be coherent to medication or whatever, but yes.

Q.  Okay.  So it's consistent, then, in theory that this person who signed this was under the influence of some type of medication that affected their ability to sign something?

MR. CLARK:  I'm going to object to that conclusion.

MS. ROSSI:  I was asking if it's a possibility.

THE COURT:  Overruled.

MR. CLARK: I'll stipulate it's possible.

THE WITNESS: I will also, if it's okay, Your Honor.

THE COURT: Go ahead.

A. I will also say, yes, it's possible. When I'm called to do a notary, I don't go into the patient's chart. I don't, you know, nothing like that. As a patient advocate, it's a different situation if they have, you know, something else. But this particular case as a notary, I don't go into the chart to see if they're on a medication or not. I respond, and if the patient is able to be coherent, answer my questions and everything, then we'll perform with the notary.

Q. Okay. And so as part of this process, you never looked at the person's, Antonio Williams's, medical charts?

A. That's correct.

Q. So you don't know what medications he may or may not have been on at the time?

A. That's correct.

Q. And would it surprise you that someone who's been shot multiple times would be on significant pain medications or other types of medications?

A. No. Of course not.

Q. Okay. Thank you.

MS. ROSSI: Nothing further.

THE COURT: Thank you.

Mr. Clark.

CROSS-EXAMINATION

BY MR. CLARK:

Q. Miss Trifillis, how long have you worked at University Hospital?

A. A year-and-a-half.

Q. And what -- where have you worked, tell the Judge what your day-to-day responsibilities are.

A. I'm a patient advocate in the Patient Relations Department. And basically that translates to if you have a issue or a problem with staff or your care or anything like that, you can call us, we can help you out with that, and we are also notaries.

Q. Okay. Now, we heard some talk that one of the things you do is notarize.

A. Um-hmm.

Q. How do you recall you got called to notarize this particular affidavit?

A. So as they come in, we have a coordinator at the front desk. As they come in, there's several advocates in the Patient Relations. And as you get a case, it kind of goes as who's up next issue. And for this particular one, I was up next. They assigned me the case, and I responded.

          MR. CLARK: Judge, can I approach?

          THE COURT: You may.

Q. I'm going to show you what's marked as Defendant's Exhibit

1 and ask you to look at that for me.

A.   Um-hmm.

Q.   All right.

THE COURT:   For my purposes, that is the same as Government's Exhibit 2?

MR. CLARK:   Yes, with one added authentication that I will get to.

THE COURT:   Okay.

A.   Okay.

Q.   Do you recognize Defendant's Exhibit 1?

A.   I do.

Q.   Now, is it fair to say that -- well, tell me what you recognize in general about Defendant's Exhibit 1.

A.   This is a copy of the affidavit that we have when we came up, and I put my initials down on the day that we met in my office to say that, yes, that is my -- my notary seal.

Q.   Okay.  And on Defendant's Exhibit 1, you say your initials. It's in blue ink on the bottom?

A.   Yes, blue ink.

Q.   And that was when Agent Reder and I were there with you and Agent Whitehouse?

A.   Yes, sir.

Q.   Okay.  And that's the affidavit that you went to Room 5248, I believe, and notarized?

A.   Yes.

Q.  Now, it's my understanding that you keep, I don't know what the word would be, a log or a journal, but notes when you go do a notary?

A.  Yes, sir.

Q.  So you can look back and go, yeah, I went to this date and time to this room?

A.  Um-hmm.  Yes, sir.

Q.  Is there any doubt in your mind that you went to the room of Antonio Williams when you had that affidavit notarized?

A.  There is no doubt in my mind that I went to that particular room.  I can't recall the room number right now.

Q.  Understood.

A.  I know it was on the fifth floor on October 31st, yes.

Q.  Okay.  I want to jump to something, I apologize, but it's something the U.S. Attorney brought up.  She asked you would it be reasonable that somebody who is in the hospital that long and with those injuries would be on pain killers on October 31st.

A.  Um-hmm.

Q.  Based on your experience and the description of the injuries, you would agree, wouldn't you, that three or four days after being injured like that, he probably almost definitely was on strong pain medication?

A.  So as of that time, I did not know the patient's injuries.

Q.  Um-hmm.

A.   Anything like that of, you know, I would assume he would be on pain medication at some point.

Q.   Okay.

A.   I'm not clinical at all, so I can't tell you how long the duration would be or what he would need or dose or anything like that.

Q.   Understood.  I guess I didn't ask this well.  But as a notary, one of the things that you have to do is make sure that when something is notarized, the patient understands the act of signing?

A.   Yes, sir.

Q.   Okay.  And it's my understanding you take steps to try to establish that in your own mind that the person who's about to sign this document in fact understands they're signing the document?

A.   Yes, sir.

Q.   Why do you do that?

A.   Just to make sure that the patient is coherent, they understand what they're signing, the importance of what they're signing, and that they're -- they know what they're signing and the meaning of it and that they're able to sign.

Q.   Now, when we talked, you said that the questions you ask are questions that I think the word you used "make them think."

A.   Yes.

Q.   Not like "how do you feel"; anybody can answer that.  But

questions that test what's going on in their brain; fair?

A. That is correct.

Q. What are the types of questions that you ask?

A. So one of the questions I ask is who is the President of the United States -- which Mr. Williams was able to answer all of these questions -- but who is the President of the United States; I usually ask the date, which is sometimes a little bit unfair to patients that have been in there a while because the days kind of run together, so then I'll say, "Do you know the day."

Q. Meaning day of the week?

A. Yes, do you know the day of the week. And verify your date of birth and, you know, where are you at today.

Q. Okay.

A. Those are my questions.

Q. And I just want to make sure it's clear. When you asked Mr. Williams, were his responses -- how did you understand his responses in terms of his mental awareness and functioning?

A. So the only one that he varied on was the date of the day. He did get the day correct, but he did vary on the date a little bit. And that's, like I said, one I kind of -- if I see that they may have a little issue at that point, then I shift it up a little bit because I do feel that they may run together.

Q. Okay.

A.   All the dates.

Q.   We've kind of talked about what you do in general and how you do it.   Explain to the -- to Magistrate Bowman what happened this day when you went to Mr. Williams' hospital room.

A.   Okay.   So prior to going to Mr. Williams' room, there were two gentlemen that entered the -- our Office of Patient Relations, and they were talking with our coordinator about getting a notary.   There was nothing rare, odd about that.   You know, like I said, we do have that happen quite often.   A little bit later, maybe a couple hours or so later, that's when I received the case to go up to Mr. Williams.

Q.   Do you recall how you received it?   Was it a phone call or did a nurse call down; how does that work?

A.   So it comes in for a phone call to our coordinator at the desk, and then she assigns it in the computer program that we have.

Q.   Okay.

A.   And then that assigns a case number to this particular notary assignment or any case that we get.

Q.   Okay.

A.   And then it comes to me, and then as it's assigned to an advocate, it's kind of dispatched to the advocate; and then we go up and respond to it.

Q.   Okay.

A.   So that's how we go up.

Q.  All right.

A.  So I received the case.  I go up, I go into the room, introduce myself.  I noticed the people over there.  Then I noticed the two gentlemen that were standing in the corner and I thought, oh, those are two gentleman that just came down, you know, a little while ago to ask about this.  And, you know, introduced myself, "Hi, how is everyone doing; I'm a notary." The patient was sitting on the bed.

Q.  Let me interrupt one second.  I apologize.  When you walked in the room, you noticed the two gentlemen, the patient on the bed and --

A.  There were three others in the room.

Q.  Do you recall when you went in where the document was, who had the document?

A.  I actually at first coming in there, I do not recall who had the document until I was presented with it.

Q.  Do you recall who presented it to you?

A.  The two gentlemen presented it to Mr. Williams, and then Mr. Williams handed me the document.

Q.  You don't -- is it fair to say that you don't know who in the room or outside the room or anywhere in the world saw that document before you walked in the room?

A.  Absolutely.  That's true.

Q.  So the other three people might well have seen it, you have no way of knowing?

A.   That's correct.

Q.   Okay.  Go ahead.  I'm sorry.

A.   So there was, if I recall correctly, there was definitely a male gentleman, kind of heavy-set African-American, sitting on the couch, and there was two other females, could have only been one other female.  They looked like the age possibly could have been mother/father figures.  No one identified who they were relationship to the patient.

Q.   That's not unusual, is it?

A.   No.  No.  People just in the room visiting.  That's all fine.

Q.   Okay.

A.   So the patient was sitting on his bed with his feet over to the side so kind of on the side of the bed.

Q.   Now, let me ask you a question:  The fact that he was sitting on the side of the bed with his feet hanging over, does that help you understand how he's doing mentally as opposed to if he's laying on his back?

A.   Absolutely, yes.

Q.   Why?

A.   Because he can coordinate himself a little bit.  He's standing, he's able to, I guess, hold hisself.

Q.   Okay.  Maintain his balance?

A.   Yes, because his feet were hanging off the edge of the bed on the side there.  And, you know, I proceeded with my

questions.  They, you know, I said -- usually I say, "I have to ask you a few silly questions," because you don't want to --

Q.  Offend them?

A.  Yes, offend anybody with the questions.  And then he presented me with the document.  I looked at the document.  And I said -- so right away when I saw the document stating that he was recanting who the person was that he identified as shooting him, I -- that's when I really started looking around the room a little bit because I was like this is very odd, what's happening.  Now the two gentlemen in the back are raising a little question.  But I must say the patient at no time seemed like he was nervous about anything, about signing anything.  That was one thing I definitely tried to take awareness of; that I did not feel that he felt pressured at all to do the signature of this.

So as we were going through it, I said -- I do my oath for the patient:  "Raise your right hand.  Do you solemnly swear under the penalty of perjury all the information in this document is true to the best of your knowledge and belief and these are of your wishes."  And I said, "You understand by signing this, you are recanting who shot you," and he agreed.  He said, "Yes, I understand."  He said, "It just wasn't how it happened.  When I came to, he was the first name that I said.  He's like my cuz," is what he said to me.  And then he proceeded with the signature.  I looked at the signature.  I

was concerned because it was of print, and I said --

Q.  Let me interrupt for a second.

A.  Yes, sir.

Q.  You watched him put the mark on there?

A.  Yes, sir.

Q.  Why did it concern you that he printed it as opposed to I'll say cursive?

A.  I guess I'm just kind of old school.

Q.  Old school, okay.

A.  Yeah, everybody signs it cursive.  So I asked him, I said, "This is your signature; correct?"  And he said, "Yes."  And I said, "You don't sign your name any other way?  You normally print your signature; is that correct?"  And he said, "Yes."

Q.  So you even, in addition to checking to make sure he mentally was present and proper, properly present, made sure that the signature was actually his as well?

A.  I -- yes.  I -- I can't verify -- the person that signed that in front of me --

Q.  Right.

A.  -- this is the signature that they signed.  And I made clear to say, "This is your signature; you print; you do not sign cursive or sign," yes.

Q.  In the time you've been at the hospital, have you ever heard of a patient leaving the hospital and a body double or somebody coming in and taking his place in bed and getting

months and months of medical therapy, physical therapy, and IV drugs?

A.   I have not heard of something like that happening.  It's very possible somebody could enter the hospital under a different name, yes.

Q.   Okay.

A.   But not go through all that at some point.

Q.   Right.  And I think you told us when we were up there with Agent Reder and Whitehouse that after you and I first talked, you made some more inquiries and talked to the nurse that you saw that had been providing treatment to Mr. Williams?

A.   So that wasn't more inquiries.  That was actually during the notary.

Q.   Okay.

A.   So at the particular time, Mr. Williams had his arm band that we identify off and it was sitting on the computer, and I said -- before the signature.  And I said, "I can't provide the notary.  You don't have your arm band on."  And he said, "Yeah, yeah, I do.  It's over there."  And I said, "Well, I can't vouch that you're who you say you are if it's not on your person."

Q.   Right.

A.   And at that time his nurse came in to administer the medication, and he said, "She can tell you who I am.  I've been here the whole time she's been treating me."  And I said, "Can

you tell me and verify and witness that this is Antonio Williams?" And she said, "Yes, it is. I've been treating him."

Q. Okay. So you have no doubt that the affidavit signed by Antonio Williams was somebody named Antonio Williams? Whether it's the one that we're talking about here or not, it was an Antonio Williams in that hospital bed?

A. They identified themselves to the hospital as Antonio Williams that was in the hospital bed, correct. That is who the hospital said was in that bed, yes.

Q. And if somebody -- and if you don't know, I understand. If somebody is brought into the emergency room and they're unconscious because of whatever medical condition, how are they identified at that point, do you know?

A. Yes. If they come in and they are unconscious and can't talk to the staff, they are labeled as a ZZZ patient. We do not identify them as a name unless something is provided for that patient.

Q. Okay. So the fact that he had a bracelet that you saw that had "Antonio Williams," somebody somewhere verified that that was Antonio Williams that belonged to that bracelet?

A. They verified that he made the statement he is Antonio Williams.

Q. Or did somebody identify him as Antonio Williams?

A. To do that, he would have to present identification as such

as a driver's license or something like that. I do not know if he did that to our admissions staff.

Q. Let me ask you this, and, again, if you don't know, I understand. If somebody is unconscious and the police show up to talk to Jay Clark and I'm unconscious in the hospital and they can verify that I am Jay Clark because of their investigation or whatever, is that sufficient for the hospital?

A. I do not know. I don't know administrationwise if it would be.

Q. Fair enough. But the policy, the standard operating procedure, is you use the bracelet that the patient has when you go in to do the notary?

A. That is correct. Which I have changed for myself since this case.

Q. Okay.

A. Yes.

Q. In the time that you've been there -- how many other people there that do notaries?

A. I think we have, real quick, five; but if you give me a second, I'll count everybody.

Q. Well, let's use five because I can do that math.

A. Okay.

Q. You have five, and you do 30 or 40 a month?

A. Each.

Q. Each?

A.   Yes.  A month, yes.

Q.   So let's say 30 and there's five; that would be 150 a month?

A.   It's very close, yes.

Q.   So over 1,500 in a year?

A.   Yes.

Q.   To your knowledge, has there ever been an issue where a person who signed and you notarized it was not the person they claimed to be?

A.   No.

Q.   Okay.

          THE COURT:  Can I stop you for a second?

          Miss Rossi, are you arguing that the individual laying in the bed is not the individual that's been identified as Antonio Williams that did not sign this?

          MS. ROSSI:  Your Honor, I'm just arguing that the circumstances surrounding the notarization were unusual.

          THE COURT:  Thank you.  Okay.

          MR. CLARK:  If that's it, then I'll stop.  I see where we're going.  Well, because the questions, it led me to believe that was what she was arguing.  I was trying to establish that there was no doubt it was him.  Never mind.

Q.   I want to ask you one last thing about the documents that you typically deal with.

A.   Yes, sir.

Q.   And I think you alluded to it.  Like a power of attorney?

A.   Um-hmm.  Yes, sir.

Q.   A last will?

A.   Yes, sir.

Q.   Something like that.  That's the stuff that would be typical that you would see in a hospital; fair?

A.   Yes, sir.  There's other -- other things, but, yes, that's typical.

Q.   A lot of them have to do with health care?

A.   Yes, sir.

Q.   Like I know this isn't a proper label but a DNR, do not resuscitate, whatever the living will is?

A.   Like health care power of attorney.

Q.   Health care power of attorney.

A.   Yes.

Q.   Are those documents, because they relate to health care, based on the questions the government asked you, once those are signed and notarized, that would be something that would probably be included in the patient chart?

A.   Yes.

Q.   Never having dealt with a document like this, is it fair to say you don't know what the next step would be after the person signs it?

I didn't ask that well.

You found that the fact that this was a recanting of an ID

of who shot him as somewhat unusual?

A.  Yes.

Q.  And that now we have this document that memorializes that?

A.  Yes.

Q.  Based on your experience, do you know what the logical next step would be for somebody to do with that document after you notarize it?

A.  Probably what the two gentlemen rushing out of the room were doing, to take it to the police department to say that Mr. Darias Jackson was not the shooter.

Q.  Basically to use it somehow to help.  So it wouldn't do them a whole lot of good to sit in the hospital room; fair?

A.  Correct.  Yes.

Q.  So the fact that they left with it, it's not as much that they left with it as just the nature of the document that is unusual; is that fair?

A.  The nature of the document, the fact that the -- when the family members that were sitting on the couch asked the patient what was he doing, he just said it was just some paperwork.

Q.  Okay.

A.  So it wasn't -- it was almost like he did not want other people in the room besides the two gentlemen to know what he was signing, yes.

Q.  Is that in and of itself unusual?

A.  It was.  It struck me as unusual, secretive.

Q.   Are there times that patients might have issues relating to their health or their finances or whatever that if they have visitors in the room, they may not want to share with the visitors?

A.   That is true.  And one thing we say is would you -- you know, we actually bring that up because of HIPAA rules --

Q.   Right.

A.   -- and laws and stuff like that, is it okay if we discuss your care in front of them, yes.

Q.   And sometimes people will not want to discuss it in front of those folks; fair?

A.   That's correct, sure.

Q.   So the fact that he appeared to not want to share with the other people in the room in and of itself is not any more unusual than some other patients you've dealt with; fair?

A.   I would say not fair, in my opinion, honestly.

Q.   That's fine.

A.   And that's only because of the nature of the document --

Q.   Okay.

A.   -- and what they were doing, yes.

Q.   I think I've got everything.  Let me ask one thing.

     (Mr. Clark conferring with the defendant.)

          MR. CLARK:  Can I just have one moment, Judge?

          THE COURT:  You may.

          MR. CLARK:  Did I admit Exhibit 1?

THE COURT:  No exhibits have been admitted yet.

MR. CLARK:  Okay.

Q.  I remember now.  I want to make sure that I have this right.  When we first talked, you didn't remember the name of the nurse; but when we came back with Agent Reder last Friday, you had found out it was Kylie Comer?

A.  That's correct.

Q.  Okay.  And that's the one who identified Mr. Williams?

A.  Yes, sir.

Q.  Okay.

MR. CLARK:  I have nothing further for Miss Trifillis. Thank you.

THE COURT:  Thank you.

Do you have anything on redirect?

MS. ROSSI:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  You may step down.

THE WITNESS:  Thank you.

* * *

EXCERPT OF PROCEEDINGS CONCLUDED

- - -

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

s/Julie A. Wolfer
_____
Julie A. Wolfer, RDR, CRR
Official Reporter

INDEX

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| PLAINTIFF'S WITNESSES:   |        |       |          |         |
| JOSEPH REDER             |        |       |          |         |
| (by Ms. Rossi)           | 2      |       | 17       |         |
| (by Mr. Clark)           |        | 12    |          |         |
| ROBERT BOHL              |        |       |          |         |
| (by Ms. Rossi)           | 21     |       | 52       |         |
| (by Mr. Clark)           |        | 35    |          |         |
| JEANETTE TRIFILLIS       |        |       |          |         |
| (by Ms. Rossi)           | 55     |       |          |         |
| (by Mr. Clark)           |        | 65    |          |         |

- - -