UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - -

UNITED STATES OF AMERICA,          :
                                   : CRIMINAL NO. 1:12-CR-95-7
              Plaintiff,           :
     -vs-                          : Excerpts of Preliminary Hearing
                                   :
DARIAS GHIZZLE JACKSON,            :
                                   : Thursday, January 23, 2020
              Defendant.           : Cincinnati, Ohio

- - -
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STEPHANIE K. BOWMAN, MAGISTRATE JUDGE
- - -


For the Plaintiff:   Kelly K. Rossi
                     Special Assistant United States Attorney
                     221 East Fourth Street, Suite 400
                     Cincinnati, Ohio  45202


For the Defendant:   Ravert J. Clark
                     114 East Eighth Street, Suite 400
                     Cincinnati, Ohio  45202




Courtroom Deputy:   Kevin Moser

Court Reporter:     Julie A. Wolfer, RDR, CRR
                    100 East Fifth Street
                    Cincinnati, Ohio  45202

                         - - -

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

PROCEEDINGS

* * *

THE COURT:  Mr. Clark, do you have anything else?

MR. CLARK:  Just with the admission of that exhibit, no.

THE COURT:  All right.  Miss Rossi, would you like to move to admit your exhibits as well?

MS. ROSSI:  Your Honor, I apologize.  I thought I already had.  But the government moves to admit Exhibits 1 through 3.

MR. CLARK:  You had more than that, didn't you?

THE COURT:  There was four.  Do you want the four?

MS. ROSSI:  I'm sorry.  Yes.  Thank you.

MR. CLARK:  You had five, didn't you?

MS. ROSSI:  1 through -- you're right, I did.  1 through 5.  They're mislabeled; 3 and 4 should be 4 and 5.  The ones with the stickers.

MR. CLARK:  I have no objection to the government's exhibits, Your Honor.

THE COURT:  Miss Rossi, do you have any objection to Mr. Clark's exhibit?

MS. ROSSI:  I do not, Your Honor.

THE COURT:  All right.  All the exhibits will be deemed admitted.

Does either side want to make argument?

MS. ROSSI:  Very briefly, Your Honor.

THE COURT:  Go ahead.

MS. ROSSI:  Thank you, Judge.

Your Honor, we're here today to establish that there is probable cause reason to believe a crime has been committed and that the defendant, Darias Jackson, has committed that crime.

Your Honor has heard extensive evidence today that both the victim and the police investigators have identified the defendant as being the one who was there, who had the opportunity, and is in fact the one who did shoot the victim. You heard that the police determined from the victim's girlfriend that they had been arguing just before; that the victim's girlfriend in fact is the one who took that video and e-mailed it that ended up in Detective Robert Bohl's possession.  There were multiple anonymous Crime Stoppers tips identifying Darias Jackson as the shooter.  And, in fact, the victim said that "D.J. shot me" on his way to the hospital. When he was interviewed days later after coming out of surgery, he told the police that D.J., Darias Jackson, whom he had known for ten years, was the person who shot him.  He was then shown a double blind photo lineup and again picked out Darias Jackson as the individual who shot him.

Your Honor, you are going to hear from the defense counsel, as you've already heard, that this victim recanted and

this affidavit shows that Darias Jackson is not in fact the person who shot him. Your Honor, I think we can all agree that the circumstances were highly unusual surrounding this notarization. You heard Miss Jeanette Trifillis say this is the only time that she's ever encountered someone recanting a criminal complaint. And certainly there are other things that are strange about this encounter and a lot of unknowns regarding who these individuals were.

I do know that the state defense attorney, Mary J. Donovan, is the one who commissioned it or is the one who was representing the defendant at the time and is the one who submitted it to the file, and I believe Clyde Bennett then took over the case after Mary J. Donovan's death and then submitted it to the State. So, Your Honor, this affidavit whose highly questionable nature is the defense's sole argument as to why there's not probable cause.

But you have heard today from Detective Bohl that he then spoke again with the victim after the state case had been dismissed, so that's at the end of December, and that the victim again, now he's out of the hospital, no longer under any medication, and saying, "No, Darias Jackson shot me. I don't remember signing this affidavit; if I did, I was under a lot of medication, and, in fact, this is the person who shot me and I want to proceed."

So, Your Honor, I believe that there is more than

probable cause at this point to show that this defendant is in fact the shooter.  Clearly, Antonio Williams was shot and gravely injured.  Hospital records indicate that there's multiple sources of information for that, even though we do not yet have those subpoenaed records in our possession.

So, Your Honor, I would say at this time the government has shown that there is probable cause, and I would ask that this Court bind this over to District Court for further proceedings.

Thank you.

THE COURT:  Thank you.

Mr. Clark.

MR. CLARK:  Your Honor, I think the government has shown that Antonio Williams got shot.  That's all they've shown you.

The video you saw, I watched you watch it and I watched you listen to it, you can't look at the video and see that it's Mr. Jackson.

The detective was asked, "Did Mr. Williams say anything on his way to the hospital?  I don't recall."  Think about that.  If Mr. Williams identified his shooter on the way to the hospital, that would be the first thing the detective would recall.  It wasn't until the government led him into that that he said, "Oh, yeah, D.J. shot me."

What else do they have?  They don't have anything.

They don't have any cell phone records that corroborate what Mr. Williams said. The video doesn't corroborate the fact of what Mr. Williams told the detective because Mr. Williams says, "We argued on the phone, then he came over." But when you look at that, that -- assuming when that was taken, which we don't know, and the detective admitted, "I don't know when it was taken and even what day it was taken."

So, I mean, the problem with no Rules of Evidence applying is you can draw from this what you want, but they've got no -- I mean, there's nothing of substance.

What do you have? The one thing you don't have is Mr. Williams here going, "No, I didn't sign this affidavit." The government had an opportunity to bring him in to say, "Yeah, I want to prosecute, this was a mistake, I was under the influence," whatever. We don't have him. He's what this is all about, and it's the elephant in the room; where is he?

What we have, though, is a notary who did her job the way that notaries are supposed to do their jobs, that's what she does, who went up and talked to Antonio Williams sitting on the edge of a bed in a hospital room, clearheaded.

Think about the identification the officer told you about. We don't know what his mental state was at the time because they didn't ask. "How are you feeling" doesn't make you think. If this was three days after major surgery having been shot multiple times, why is that identification entitled

to any more credibility than the government wants you to give this affidavit?

And at some point we have to have some reliable evidence that Darias committed this offense, and there isn't any.  And you can go through everything they've got.  They got a video and they've got some anonymous tips.  But anonymous tips have no value.  They're just that.  They're tips to be followed up on.

Well, what did the detective do to follow up on it?  Did he get cell phone records from Mr. Williams or did he get cell phone records from Mr. Jackson to corroborate what Mr. Williams told him?  No.  Do we have anything that corroborates anything Mr. Williams told him?  No.  Do we even know if the detective talked to Mr. Williams on the phone?  No.  He thinks he did.  He might very well have.  But he admitted, "I've never talked to him on the phone before."  How can -- how much weight can you give that?

So I realize the standard is embarrassingly low here, but at the end of the day, Mr. Williams is going to have to come into court either with a government subpoena or my subpoena and say, "Yeah, I signed this," or, "No, I didn't."  And if he didn't, he's committed perjury here.  And if he comes in and says he signed it, then what do you believe?  And I think there's not probable cause, and I think the case should be dismissed.

* * *

(Excerpt of Preliminary Hearing was previously transcribed and filed at Document 438.)

* * *

MR. CLARK:  Your Honor, can I address his continued detention?

THE COURT:  You can.

MR. CLARK:  In light of what you've heard, I'm going to ask that you release Mr. Jackson on EMU.

I talked to Mr. Barbeau this morning, and he said they do have the ability to put him on electronic monitoring and they can set exclusion zones that if he travels past a certain point, they would be alerted.

It's my understanding based on my most recent review of court records that Mr. Williams now apparently lives on the west side on Rapid Run.  Mr. Jackson has no reason to be anywhere west of I-75, and I don't think he's a danger to himself or the community.  He's got no history of violence in his record, and I think what's in the affidavit is true and accurate.  I don't think he's a danger to Mr. Williams or anybody else.  And I would ask you to consider releasing him on electronic monitoring.

THE COURT:  All right.  Miss Rossi.

MS. ROSSI:  Your Honor, well, first, as a point in fact, it's not correct that he has no crimes of violence in his

record.  He was found adjudicated delinquent of aggravated menacing and aggravated robbery.

Your Honor, I have also spoken to Mr. Barbeau subsequent to his conversation with Mr. Clark, and Mr. Barbeau made clear to me that while they may have that capability, he did not feel that this was an appropriate case for that electronic monitoring because of the high risk.

And Mr. Clark just helpfully read out the victim's residence in open court in front of the defendant who's accused of shooting him which I think is highly irresponsible and irregular.

So, Your Honor, I would say --

MR. CLARK:  Well, actually, you know, I'm going to take exception to that.

MS. ROSSI:  Excuse me.  Please don't interrupt.

MR. CLARK:  I said "on Rapid Run."

THE COURT:  All right.  Hold on.

MR. CLARK:  I didn't give an address.  I didn't give a street --

MS. ROSSI:  He gave a street name and the side of town where the victim was just almost murdered by his client.  I think that's inappropriate.

MR. CLARK:  I live on Rapid Run too.

MS. ROSSI:  You're allowed to live wherever you want. I don't --

THE COURT:  Okay.  Let's not have counsel talk to each other; just to me, please.

MS. ROSSI:  Thank you.  I just don't like being interrupted, Your Honor, so I appreciate that.

Judge, I do think that given Probation's opinion that this is a high-risk situation, that we do have someone who's attempted murder, was almost killed, I don't think that this is an appropriate time to move for release.  I do think that since this will be bound over, that defense can take this up with the judge in that case and then at that time can present argument, and at that time the government will be able to prepare to make that argument why he should continue to be detained.

THE COURT:  All right.  Thank you.

Mr. Barbeau, I'd like to hear from you since both counsel have indicated they have had conversations with you.

PROBATION OFFICER BARBEAU:  Thank you, Your Honor.

THE COURT:  What is your recommendation?

PROBATION OFFICER BARBEAU:  Your Honor, Mr. Clark is correct, we do have the technology.  Miss Rossi -- Miss Rossi is also correct; that's staff, one supervisor, the EM specialist, and, of course, my own opinion.

Given the direct grave nature of these allegations, if I understand Mr. Clark correctly, the point would be to offer some kind of assurance that the victim would not be contacted or in harm's way.  We simply could not do that.  We might be

able to tell that the defendant has crossed into an exclusionary zone. That does not protect the victim. Given the serious nature of the allegations, we don't feel comfortable for public safety reasons to endorse that plan.

THE COURT: All right. Thank you.

Having heard from Mr. Barbeau, I am not going to change the detention order at this time.

I suggest that you all get in contact with Barb Crum and see if you can get on Judge Barrett's docket soon.

All right. Thank you.

MS. ROSSI: Thank you, Your Honor.

(Proceedings concluded at 3:26 p.m.)

- - -


C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

s/Julie A. Wolfer
Julie A. Wolfer, RDR, CRR
Official Reporter


- - -

INDEX

| EXHIBITS | ADMITTED |
|---|---|
| Plaintiff's Exhibits 1, 2, 4, 5 | 2 |
| Defendant's Exhibit 1 | 2 |

- - -